.

# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SCOTT K. RICKS,<br><br>       Plaintiff,<br><br>   v.<br><br>G. LEVINE, et al.,<br><br>       Defendants. | Case No.: 1:15-cv-01150-AWI-BAM (PC)<br><br>ORDER GRANTING DEFENDANT FORSTER'S MOTION TO MODIFY THE SCHEDULING ORDER NUNC PRO TUNC<br>(ECF No. 51)<br><br>FINDINGS AND RECOMMENDATIONS RECOMMENDING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT BE GRANTED<br>(ECF No. 49, 60)<br><br>**FOURTEEN (14) DAY DEADLINE** |

Plaintiff Scott K. Ricks is a state prisoner proceeding *pro se* and *in forma pauperis* in this civil rights action pursuant to 42 U.S.C. § 1983. This action is related to *Ricks v. Austria*, 1:15-cv-1147-AWI-BAM and to *Ricks v. Onyeye, et al*., 1:15-cv-1148-AWI-BAM.

## I.     Background

This case proceeds on Plaintiff's first amended complaint against Defendants Drs. G. Levine and M. Forster for deliberate indifference to Plaintiff's serious medical need in violation of the Eighth Amendment. (ECF No. 25.) As discussed in more detail below, Plaintiff's alleges that Defendant Levine performed two "botched" surgeries on Plaintiff on May 6, 2010 and April 21, 2011, and that Dr. Forster refused to schedule Plaintiff for corrective surgery in 2011 and 2012. (*Id*.)

Following Defendants' answer to the first amended complaint, (ECF No. 34), on November 16, 2016, the Court issued a discovery and scheduling order in this matter, (ECF No. 36). The deadline set for filing all dispositive motions was July 7, 2017. (ECF No. 36 at 4.)

On July 7, 2017, Defendant Levine filed a motion for summary judgment under Federal Rule of Civil Procedure 56, on the grounds that Plaintiff is unable to raise a triable issue of fact to support his claim that Defendant Levine violated Plaintiff's rights under the Eighth Amendment. (ECF No. 49.) On August 8, 2017, the Court ordered the motion re-served on Plaintiff, and granted Plaintiff an extension of time to respond to the motion. (ECF No. 55.) Plaintiff filed an opposition to Defendant Levine's motion on September 11, 2017. (ECF No. 58.) Defendant Levine filed a reply to Plaintiff's opposition on September 18, 2017. (ECF No. 59.)

Meanwhile, on July 27, 2017, Defendant Forster filed a motion to modify the discovery and scheduling order. Defendant Forster sought to gather evidence related to recent medical treatments that Plaintiff had undergone, and to extend the dispositive motion deadline so that Defendant could file a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (ECF No. 51.) Plaintiff did not file any response to this motion.[1]

On October 30, 2017, Defendant Forster filed a motion for summary judgment under Federal Rule of Civil Procedure 56, on the grounds that the undisputed facts show that Defendant Forster was not deliberately indifferent to Plaintiff's serious medical need in violation of the Eighth Amendment. (ECF No. 60.) On November 27, 2017, Plaintiff filed an opposition to Defendant Forster's motion for summary judgment. (ECF No. 61.)

---

[1] Defendant Forster explained in the motion that Plaintiff's deposition revealed he had a third hernia surgery on February 27, 2017, and thus discovery needed to be re-opened to allow for gathering evidence related to that surgery. Further, Defendant Forster needed additional time to prepare the motion for summary judgment taking into account the surgery.

Defendants have now submitted the evidence in support of the instant motion for summary judgment, it having apparently been produced in one of the related actions. Thus, the request to re-open discovery is rendered moot, although the Court finds that the discovery should be allowed to be used in this related case for purposes of judicial economy and in the interests of justice. Furthermore, the Court finds good cause to grant Defendant Forster's request to extend the deadline to submit a motion for summary judgment, in order to deem Defendant Forster's motion to be timely filed.

On December 4, 2017, Defendant Forster sought an extension of time to file a reply to Plaintiff's opposition to the motion for summary judgment, (ECF No. 62), which was granted, (ECF No. 63). On January 18, 2018, Defendant Forster filed a reply to Plaintiff's opposition. (ECF No. 65.)

The above motions are deemed submitted, without oral argument. Local Rule 230(l).

## II. Motions for Summary Judgment

### A. Legal Standards

Summary judgment is appropriate when the pleadings, disclosure materials, discovery, and any affidavits provided establish that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that may affect the outcome of the case under the applicable law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Id.*

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The exact nature of this responsibility varies depending on whether the issue on which summary judgment is sought is one in which the movant or the nonmoving party carries the ultimate burden of proof. *See Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). If the movant will have the burden of proof at trial, it must "affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Id.* (citing *Celotex*, 477 U.S. at 323). In contrast, if the nonmoving party will have the burden of proof at trial, "the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case." *Id.*

If the movant satisfies its initial burden, the nonmoving party must go beyond the allegations in its pleadings to "show a genuine issue of material fact by presenting affirmative evidence from which a jury could find in [its] favor." *F.T.C. v. Stefanchik*, 559 F.3d 924, 929

(9th Cir. 2009) (emphasis omitted). "[B]ald assertions or a mere scintilla of evidence" will not suffice in this regard. *Id.*; *see also Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) ("When the moving party has carried its burden under Rule 56[ ], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.") (citation omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

In resolving a summary judgment motion, "the court does not make credibility determinations or weigh conflicting evidence." *Soremekun*, 509 F.3d at 984. Instead, "[t]he evidence of the [nonmoving party] is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Anderson*, 477 U.S. at 255. Inferences, however, are not drawn out of the air; the nonmoving party must produce a factual predicate from which the inference may reasonably be drawn. *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898 (9th Cir. 1987).

In arriving at these findings and recommendations, the Court carefully reviewed and considered all arguments, points and authorities, declarations, exhibits, statements of undisputed facts and responses thereto, if any, objections, and other papers filed by the parties. Omission of reference to an argument, document, paper, or objection is not to be construed to the effect that this Court did not consider the argument, document, paper, or objection. This Court thoroughly reviewed and considered the evidence it deemed admissible, material, and appropriate.

## B.    Summary of Complaint Allegations

Plaintiff is an inmate in the custody of the California Department of Corrections and Rehabilitation ("CDCR") at Salinas Valley State Prison. The events at issue occurred while Plaintiff was incarcerated at the Sierra Conservation Camp ("SCC") in Jamestown, California.

Plaintiff alleges that in February 2009, he was transferred from California Men's Colony in San Luis Obispo, California, to SCC. When he arrived, he had an umbilical and a ventral hernia. Once Plaintiff was finally seen by his primary care physician, Defendant Forster, he

4

notified Defendant of his two, separate hernias. Defendant Forster told Plaintiff that he would need urgent surgery, and filed a request for him to be seen by a surgeon.

Over six months later, Plaintiff was seen by the surgeon, Defendant Levine, who agreed that Plaintiff needed an urgent surgery. Defendant Levine ordered an ultrasound, which was inconclusive. Defendant Levine told Plaintiff that he needed a CAT scan, so that he could get the exact sizes of the two hernias, so that he could repair them with abdominal mesh. Plaintiff had the CAT scan performed, and Defendant Levine called MEIN, and told Plaintiff that he had the exact size of mesh, and that he was ready to proceed with the surgery.

On May 6, 2010, Plaintiff was taken to Mark Twain Hospital in San Andreas, California, to have the surgery. Before the surgery, Defendant Levine came to Plaintiff and told him that he was ready to proceed and that he would be placing the mesh over the two hernias to repair them. Plaintiff had the surgery.

When Plaintiff awoke from surgery, Defendant Levine told Plaintiff that he decided that using the mesh was not necessary, so he did not use it, and decided to just sew up the hernias instead. After several days, Plaintiff was sent back to his cell.

In less than thirty days, the ventral hernia had returned, this time even bigger than before. Plaintiff was in unbearable, excruciating pain. Plaintiff immediately showed Defendant Forster that the ventral hernia had returned, and was even bigger than before. Defendant Forster told Plaintiff that he would need another surgery. Plaintiff asked Defendant Forster if he could have a different surgeon, since Defendant Levine had lied to him that he ordered tests specifically to use the size of mesh needed to repair the hernias, but did not use the mesh and botched the surgery. Defendant Forster told Plaintiff no.

Plaintiff was put up for a second surgery, and several months later, was seen by Defendant Levine. By this time, Plaintiff was suffering unbearable, excruciating, constant, abdominal pain, especially when performing bowel movements.

Several months later, a second CAT scan was performed, to see how bad the ventral hernia was. Plaintiff was seen by Defendant Levine to review the CAT scan, and Plaintiff demanded that Defendant Levine use the correct size of mesh for the second surgery. Defendant

Levine said that he had reviewed the CAT scan and that he had the exact-sized piece of mesh required to perform the surgery.

On April 21, 2011, Plaintiff was called out for the second surgery. Again, Plaintiff was taken to Mark Twain Hospital and again Defendant Levine assured Plaintiff that he would be using the mesh to repair the hernia. Plaintiff was on the operating table, cut open, for almost seven hours. After the surgery, Plaintiff spoke to Defendant Levine, who confirmed that he used the mesh to repair the ventral hernia.

After about ten days in the hospital, Plaintiff was sent back to his cell with a drainage tube and bag extruding from his abdomen. After two weeks, the staples were removed from the incision site. After four weeks, the drainage tube and bag were removed.

On or about August 1, 2011, the ventral hernia ruptured around the mesh, causing three separate, new ventral hernias. Plaintiff was in severe, unbearable, excruciating pain, which continues to this day. It looks like there are two softballs sticking out under the skin on Plaintiff's right side of the abdomen.

On or about August 15, 2011, Plaintiff told Defendant Forster that he was in severe, unbearable, excruciating pain, and requested a third hernia surgery by a different surgeon. Dr. Forster refused to approve Plaintiff's request for a third hernia surgery even after Plaintiff repeatedly told him that he was in pain. Defendant Forster claimed that because Plaintiff was within six months of his release date, the third surgery would not be approved by the medical administration at the prison. Besides, Defendant Forster said, Plaintiff was being released soon, and it would no longer be the State's responsibility to provide him medical care.

On or about August 15, 2011, Plaintiff filed an administrative appeal as a staff complaint, and a request for a third hernia surgery, against Defendants. The appeal was lost, and never returned to Plaintiff.

On or about September 15, 2011, Plaintiff was seen by Defendant Levine and Plaintiff showed him the three ruptured, ventral hernias, and told him that he had performed a second botched, failed surgery on him. Plaintiff further told Defendant Levine that he was in pain. Defendant Levine refused any type of medical treatment.

On or about November 15, 2011, Plaintiff was seen by Defendant Forster. Plaintiff showed Defendant Forster the three ruptured, ventral hernias. Plaintiff again told Defendant Forster that he was in pain. Defendant Forster refused Plaintiff any type of medical treatment.

On or about February 15, 2012, Plaintiff was seen again by Defendant Levine. Plaintiff again showed Defendant Levine the hernias, and told him that he was in pain. Again, Defendant Levine refused any kind of treatment.

On or about February 15, 2012, Plaintiff filed another administrative complaint against Defendants. This appeal was lost, and never returned to Plaintiff.

On or about February 25, 2012, Plaintiff was again seen by Defendant Forster, and again showed Defendant Forster the hernias and stated that he was in pain. Defendant Forster again refused treatment.

On or about February 28, 2012, Plaintiff was released from SCC.

## C.      Undisputed Material Facts[2]

Plaintiff is a currently-incarcerated state inmate. (Pl.'s Dep. 8:24-9:16.) Plaintiff has no formal education in the medical or mental health fields. (Pl.'s Dep. 10:5-21.) Plaintiff has never worked in the medical or mental health field. (Pl.'s Dep. 10:22-11:1.)

### 1.      Sierra Conservation Center

Plaintiff was housed at Sierra Conservation Center from February 25, 2009, until he was paroled on February 27, 2012. (Feinberg Decl. ¶ 7, Ex B.)

Defendant Forster was Plaintiff's primary care physician at Sierra Conservation Center, beginning around August 28, 2009. (Forster Decl. ¶ 5.) On December 4, 2009, Plaintiff was seen by Defendant Forster concerning a hernia that presented about two years prior. Defendant Forster submitted a referral for a general surgery consult. (First Am. Compl., ECF No. 25, at 4; 12/4/2009 Forster Notes, ECF No. 25, at 56.)

---

[2] *See* Separate Statement of Undisputed Material Facts in Support of Motion for Summary Judgment on behalf of Defendant Glen Levine, M.D., (ECF No. 49-1), Defendant Forster's Statement of Undisputed Facts in Support of Motion for Summary Judgment, (ECF No. 60-3), and Plaintiff's Response to Defendants' Statement of Undisputed Facts In Support of Motion for Summary Judgment and Opposition to Granting Summary Judgment, (ECF No. 46).

Plaintiff received a CT scan on February 22, 2010, which showed a ventral hernia containing colon, but without obstruction. Defendant Forster referred Plaintiff to Defendant Levine for surgical evaluation. (3/4/2010 Forster Notes, ECF No. 25, at 65; Mark Twain Hospital Reports, No. 49-2, at 35-46; Decl. of Barry Gardiner ("Gardiner Decl."), ECF No. 49-2, ¶ 4(c).)

At the time that Defendant Levine provided care to Plaintiff, he was a general surgeon contracted by the California State prison system to see patients on referrals for surgery. Unless the patient was referred by a primary care doctor for a surgery consultation, Defendant Levine could not see the patient. (Decl. of Glenn Levine, M.D. ("Levine Decl."), ECF No. 49-2, ¶ 7.)

On May 6, 2010, Plaintiff underwent hernia repair surgery performed by Defendant Levine at Mark Twain St. Joseph's Hospital. (Feinberg Decl. ¶ 9, Ex H; Forster Decl. ¶¶ 6-11.) Prior to the surgery, Defendant Levine had discussed with Plaintiff using mesh to repair the hernia, and Defendant Levine had an Ultrapro mesh system available during the procedure. (Levine Decl. ¶ 3.)

Once Defendant Levine examined Plaintiff intraoperatively, Plaintiff was found to have a small epigastric hernia, a small umbilical hernia, and diastasis of rectus sheath. During the procedure, Defendant Levine repaired the ventral hernia and a smaller umbilical hernia. Both hernias were repaired without using mesh, and instead using sutures to close the hernias. (5/14/2010 Forster Notes, ECF No. 25, at 69; Levine Decl. ¶ 3.) Defendant Levine determined that suturing the hernia would be more appropriate than the use of an Ultrapro mesh system due to Plaintiff's age, as well as the nature and location of the defects. (Levine Decl. ¶ 3.)

On January 18, 2011, Defendant Forster saw Plaintiff for the recurrence of the hernia. (Feinberg Decl. ¶ 10, Ex I; Forster Decl. ¶¶ 12-15.) The supra-umbilical hernia recurred, and Plaintiff was again referred to Defendant Levine by Defendant Forster. Imaging confirmed that the supra-umbilical hernia had recurred. The umbilical hernia did not recur. (Mark Twain Hospital Reports.)

On April 21, 2011, Defendant Levine performed a second surgical hernia repair on Plaintiff. (Feinberg Decl. ¶ 10, Ex J; Forster Decl. ¶ 16; Mark Twain Hospital Records.) Defendant Levine performed the hernia repair with mesh. During the procedure, Defendant

Levine used an underlay technique to place a 20x15 cm piece of surgical mesh which was then sutured into the abdominal wall. The procedure was completed without complication. Plaintiff was discharged from the hospital on April 25, 2011. (Mark Twain Hospital Records.) Defendant Levine continued to follow Plaintiff after his procedure and through July of 2011, when Defendant Levine discharged Plaintiff in an asymptomatic condition from his clinic back to Defendant Forster. (*Id.*; Levine Decl. ¶ 5.) Specifically, Plaintiff's medical records state that in July 2011, he was discharged as having zero "issues or problems," that his incision was "well-healed" and that there was no recurrence. (7/26/2011 Consultation Notes, ECF No. 60-6, at 15.)

The mesh procedure that Defendant Levine performed on April 21, 2011 was the optimal procedure that he had the ability to perform to address Plaintiff's incisional hernia. Following Plaintiff's discharge from Defendant Levine's clinic in July 2011, had Plaintiff been referred back to Defendant Levine with yet another hernia, he would not have been able to provide further surgical treatment. Plaintiff would have needed to have been referred to another facility that would have been able to perform a more complicated surgical repair. Such a referral would have to be approved by CDCR. The specialists needed to perform such a repair were unavailable at Mark Twain St. Joseph's Hospital. (Levine Decl. ¶ 8.)

Plaintiff claims that the hernia recurred a second time on or about August 2011. (Pl's Dep. 63:5-9; 63:5-14.)[3]

On August 4, 2011, Plaintiff refused a scheduled follow-up appointment to see Defendant Forster regarding his hernia. Plaintiff wrote on the refusal form, "I just saw Dr. Forster 3 weeks ago. I don't need to see him again. This is an unnecessary appointment. Thank you." (Forster Decl. ¶ 21, Ex. E.)

///
///
///
///

---

[3] The parties dispute whether the hernia in fact recurred at this time, but agree for the purposes of these motions that Plaintiff asserts that the hernia recurred at some point on or about August 2011.

On August 19, 2011, Plaintiff refused a regularly scheduled appointment to see Defendant Forster. He wrote on his refusal form, as follows:

> I am refusing the Dr. Forster appointment for 8-19-2011. I did NOT request this appointment; Dr. Forster did NOT request this appointment. I just saw him on 6-6-2011, and I will see him again in September for my chronic care update. Do not re-ducat me until then.

(Forster Decl. ¶ 22, Ex. F.)

On September 22, 2011, Defendant Forster met with Plaintiff for a regularly scheduled appointment regarding his chronic medical conditions. Defendant Forster wrote that Plaintiff did not have any complaints regarding his hernia, and Plaintiff had healed from his hernia surgery earlier in the year. (Forster Decl.¶ 23.)

On October 18, 2011, Plaintiff saw Defendant Forster to request modifications in his chronos; specifically, to have a tall table at visiting due to complaints of chronic back pain. Defendant Forster's notes reflect that Plaintiff had no complaints related to his prior hernia or hernia surgeries. (10/28/2011 Medical Progress Note, ECF No. 49-2, at 64.)

On February 6, 2012, Plaintiff refused to submit to blood tests for scheduled lab tests. On the refusal form regarding this treatment, Plaintiff wrote, "I refuse to give blood on 2-6-2012. I refuse this and any/all future lab ducats. I go home in 3 weeks – thanks anyway." Later, on February 13 and 14, 2012, Plaintiff refused several prescribed medications. (Forster Decl.¶ 24, Ex. H.)

On February 23, 2012, Plaintiff refused to attend his final scheduled appointment with Defendant Forster before being paroled. Plaintiff wrote on the refusal form, "I am being released in 3 days, and I do not need to be seen by Dr. Forster or any other medical staff. I did not request to be seen by Dr. Forster. He can renew my parole meds without me! Thank you." (Forster Decl.¶ 25, Ex. I.)

According to the opinion of Barry N. Gardiner, M.D., a State of California board-certified general surgeon, Defendant Levine complied with the standard of care with respect to the care and treatment provided to Plaintiff. Specifically, it was within the standard of care for Defendant Levine to perform Plaintiff's initial May 6, 2010 hernia repair without the use of

mesh, based on his intraoperative finding that suturing the hernias closed was appropriate given the size and locations of the hernias and the patient's age. (Gardiner Decl. ¶¶ 5-8.)

Further, Dr. Gardiner opinions that the second surgical procedure performed by Dr. Levine using surgical mesh was appropriate and done with a technique that was well-within the standard of care, using appropriate surgical equipment and supplies and performing the procedure appropriately and in the standard fashion. Although Plaintiff's hernia recurred, this is a well-known and recognized risk of any hernia repair and occurs in up to 15% of patents, and the fact that the hernia recurred does not evidence a breach of the standard of care. (*Id.*)

According to the opinion of Dr. B. Feinberg, Chief Medical Consultant for the California Correctional Health Care Services, there was no indication that Plaintiff's hernia recurred for the second time while he was at SCC under Dr. Forster's care. On the contrary, medical records indicate that the second recurrence did not happen until Plaintiff was paroled and left SCC. (Feinberg Decl. ¶¶ 11-12.) Therefore, there is no indication that Defendant Forster was aware of any second recurrence of Plaintiffs hernia, and the record reflects a lack of serious, hernia-related medical issues after his second surgery. (*Id.* at ¶ 30(m).)

Further, Dr. Feinberg opines that, based on Plaintiff's medical records Defendant Forster would not have been deliberately indifferent to Plaintiff's hernia condition by not referring him for a third hernia surgery after his hernia recurred the second time. This is because denial of a third corrective surgery was medically acceptable under the circumstances, due to Plaintiff's medical history, physical condition, and the risks of surgery. (*Id.* at ¶ 30.)

**2.      Parole and Re-Incarceration at North Kern State Prison**

For nearly a year-and-a-half, from February 27, 2012 to June 2013, Plaintiff was out on parole. (Pl.'s Dep. 14:17:1; 71:13-17.) In June 2013, Plaintiff re-offended while on parole and was re-incarcerated. (Pl.'s Dep. 71:13-17.) After Plaintiff was re-incarcerated, he was housed at North Kern State Prison from December 19, 2013, to May 29, 2014. (Feinberg Decl. ¶ 13, Ex B.)

Plaintiff had an intake examination at North Kern State Prison on December 23, 2013, conducted by Nurse Practitioner ("NP") Chernekoff. NP Chernekoff noted in the examination report that Plaintiff's hernias had recurred. (Feinberg Decl. ¶ 14, Ex. Q.)

NP Chernekoff also noted a lack of abdominal pains/cramps, bowel sounds present in all four quadrants, and therefore that Plaintiff's hernias were not incarcerated, and thus, his hernias were not an acute or emergency condition. (Feinberg Decl. ¶ 14, Ex. Q; Austria Decl. ¶¶ 3, 12.)

While at North Kern State Prison, Plaintiff saw Dr. Austria on January 10, 2014, February 18, 2014, April 1, 2014 and April 29, 2014. (Feinberg Decl. ¶¶ 15-20, Ex. Q; Pl.'s Dep. 72:14-25; Austria Decl. ¶ 2.) On those dates, Dr. Austria saw Plaintiff for treatment of seizures, his lower back condition, and about the renewal of his anti-diarrhea medication. (Feinberg Decl. ¶¶ 15-20; Pl's Dep. 74:10-75:6; 76:1-7; Austria Decl. ¶ 2.) Specifically, Plaintiff first saw Dr. Austria on January 10, 2014. Dr. Austria noted that Plaintiff's chief complaint was "seizures," and he complained of a seizure a month prior. (1/10/14 Progress Note, ECF No. 43-5, at 52.) Dr. Austria also noted that Plaintiff's anti-seizure medication Dilantin was under the therapeutic standard, increased Plaintiff's Dilantin, and noted: "Ventral hernia stable, non-tender." (*Id*.)

On February 18, 2014, Plaintiff submitted a Health Care Services Request Form stating that he had a seizure that morning, and it was his third seizure in thirty-five days. (2/18/14 Health Care Services Request Form, *id*. at 54.) Plaintiff also wrote that he wanted to see his primary care physician to increase his seizure medication. (*Id*.) Dr. Austria saw Plaintiff that same day, and noted again that Plaintiff's chief complaint was seizures. (2/18/14 Progress Note, *id*. at 56.) Plaintiff also complained of lower back pain. (*Id*.) Dr. Austria noted that Plaintiff's ventral hernia was "stable." (*Id*.) Dr. Austria ordered x-rays of Plaintiff's lower back, and ordered blood work to check Plaintiff's levels of Dilantin. (*Id*.)

Plaintiff's blood was drawn that same day, and the blood test showed that Plaintiff's Dilantin level was lower than therapeutic levels. (2/18/14 Report, *id*. at 58.) Dr. Austria ordered that Plaintiff's Dilantin prescription be increased, and for Plaintiff's levels to be re-checked in two weeks. (*Id*.) The next month, a follow-up blood test on March 5, 2014, showed that Plaintiff's Dilantin levels were within proper limits. (3/5/14 Report, *id* at 60.)

Plaintiff's x-rays were done on February 18, 2014, and showed that Plaintiff had mild degenerative changes at L4 and L5. (Lumbar Spine X-ray, *id*. at 62.) Finding that this is not uncommon to see in an obese, forty-seven-year-old man, and was not an acute condition that

required urgent treatment, Dr. Austria continued Plaintiff's pain medication for Plaintiff's lower back pain. (Austria Decl., ECF No. 43-4, ¶ 8.)

On April 1, 2014, Dr. Austria saw Plaintiff for an auto-refill for Loperamide, an anti-diarrheal. (4/1/14 Progress Note, ECF No. 43-5, at 64.) Plaintiff claimed that his anti-depression medication, Sertraline (Zoloft) gave him diarrhea. (*Id.*) Lopermide cannot be auto-refilled, and must instead be reviewed by a physician upon each refill, so Defendant found that a Lopermide prescription should be monitored and an auto-refill was not in Plaintiff's best interest. (Austria Decl. ¶ 9.) . Dr. Austria also noted in his progress notes that Plaintiff's "[v]entral hernia [was] stable [and to] continue with activity precaution." (4/1/14 Progress Note.)

Dr. Austria saw Plaintiff for the last time on April 29, 2014, for a medication evaluation. (4/29/14 Progress Note, *id.* at 66.) Plaintiff again requested an auto-refill for Loperamide, which was again denied. (*Id.*) Dr. Austria wrote that he told Plaintiff to notify the Licensed Vocational Nurse three days before he runs out, and that Plaintiff agreed with this plan. Dr. Austria also noted that Plaintiff "has no other issues at this time" and "[v]entral hernia stable continue activity precaution." (*Id.*)

### 3. Pleasant Valley State Prison

On May 29, 2014, Plaintiff left North Kern State Prison and was housed at Pleasant Valley State Prison. (Feinberg Decl. ¶ 21; Pl's Dep. 75:7-11.) Dr. Onyeje was the Chief Medical Officer at Pleasant Valley State Prison. (Feinberg Decl. ¶ 21; Pl.'s Dep. 78:23-79:2.) Typically, the Chief Medical Executive does not personally examine and treat inmate patients, but oversees the inmate's care that other physicians directly provide. (Feinberg Decl. ¶ 21.)

On July 28, 2014, Dr. Onyeje approved Dr. La Sierra's request for a hernia repair surgical consultation. (Feinberg Decl. ¶ 22, Ex. Z.)

On September 23, 2014, Dr. Michael (an outside surgeon associated with San Joaquin Community Hospital and Mercy Hospital, Bakersfield) examined Plaintiff. Dr. Michael's report states that Plaintiff needed component separation repair and suggested that Plaintiff be sent to USC's tertiary care center. (Feinberg Decl. ¶ 22, Ex. AA.)

///

A tertiary care center involves advanced and complex procedures and treatments, performed by medical specialists in state-of-the-art facilities. (Feinberg Decl. ¶ 22; Pl.'s Dep. 21:1-2.)

On October 28, 2014, Dr. Onyeje spoke to Dr. Michael regarding Plaintiff's hernias. Dr. Michael told Dr. Onyeje that because of the large size of the hernia, the likelihood of incarceration (or strangulation) of the hernia was very low. Dr. Michael warned that surgical repair, or herniorrhaphy, in Plaintiff's case was dangerous: "associated with both high morbidity and high mortality risks." (Feinberg Decl. 24, Ex. CC.) Dr. Michael further agreed that a conservative approach, by use of an abdominal binder, would be the safest treatment at that time, and if surgical repair is required, it should be performed at a tertiary surgical center. (*Id.*)

On October 2, 2014, Dr. Chokatos, a board certified doctor of internal medicine, saw Plaintiff. Dr. Chokatos wrote in his medical progress notes for the visit that Plaintiff's "abdominal wall looked very thin and the organs could be felt right through the skin without any difficulty. There was little abdominal muscle that could be felt." (Feinberg Decl. ¶ 23, Ex. BB.) Dr. Chokatos opined that due to Plaintiff's lack of abdominal muscle, surgery was not likely to succeed. Dr. Chokatos recommended conservative treatment, *i.e.*, an abdominal binder and discussed the case with Dr. Onyeje. (Feinberg Decl. ¶ 23, Ex. BB.) Specifically, Dr. Chokatos' report stated: "The case was discussed with the Chief Medical Officer Onyeje. A general surgeon had seen him locally, but says that closure could not be performed in their facility as the hernias are too large and the anatomy is difficult. For that reason, the patient wants to be referred to a Tertiary Care Center. Unfortunately, the huge hernia would require developed abdominal wall tissue to effect closure. This is not the case; his musculature is essentially atrophic. He has already failed mesh closure. The best option is an abdominal binder." (Feinberg Decl. ¶ 23, Ex. BB.)

On June 3, 2015, Dr. Onyeje again considered surgical hernia repair at the request of Dr. Conanan. Dr. Onyeje referred the issue to the Medical Authorization Review (MAR) Committee. (Feinberg Decl. ¶ 25, Ex. DD.) The MAR Committee consists of representatives from the health care staff of each institution and no less than three staff physicians. (Feinberg Decl. ¶ 25, Ex.

DD.) On June 9, 2015, the MAR Committee held that the risk of surgery outweighed the benefits, and recommended conservative treatment. (Feinberg Decl. ¶ 25, Ex. DD.)

### 4. Salinas Valley State Prison

On February 1, 2016, Plaintiff was transferred from Pleasant Valley State Prison to Salinas Valley State Prison. (Feinberg Decl. ¶ 26, Ex. B at 1.) While at Salinas Valley State Prison, Plaintiff's case was referred to medical staff at San Joaquin General Hospital and Twin Cities Community Hospital for consultation regarding the possibility of a surgical repair for his recurrent hernia. These hospitals refused to perform the procedure. (Feinberg Decl. ¶ 26; Pl.'s Dep. 18:8-24; 21:9-23:13; 26:3-11; 27:18-28:12.)

Plaintiff had a third hernia corrective surgery on February 27, 2017, at Stanford University Medical Center ("Stanford"). (Feinberg Decl. ¶ 27; Pl.'s Dep. 17: 20-24; 21:1-4.) Stanford is a tertiary care center and one of the best hospitals in the United States with very high quality medical care. (Feinberg Decl. ¶¶ 22, 26; Pl.'s Dep. 17:24-18:7.)

Dr. Spain, a surgeon at Stanford, first saw Plaintiff on November 1, 2016, and told Plaintiff he would do the surgery. (Feinberg Decl. ¶ 27; Pl.'s Dep. 26:16-25.) Dr. Spain gave Plaintiff the option of not having the surgery at all and simply living with the condition as it was. (Feinberg Decl. ¶ 28; Pl.'s Dep. 30:5-12.) Dr. Spain warned Plaintiff that risks of surgery included bowel injury and other complications. (Feinberg Decl. ¶ 27.) Dr. Spain warned Plaintiff that one of the risks of surgery was death. (Pl's Dep. 37:1-9.) Dr. Spain warned Plaintiff that one of the risks of surgery was recurrence of the hernias. (Feinberg Decl. ¶ 28; Pl's Dep. 38:10-21.) Specifically, Dr. Spain's notes place the risk of complication at 20%, a significant percentage, with a 5% chance of serious complications and a 20% chance of recurrence. (Feinberg Decl. Ex. EE.)

At the time of the third corrective surgery, Plaintiff was forty-nine years old, obese, and in poor physical condition. Plaintiff's age and physical condition greatly increased the risks of surgery and the possibility of a third recurrence. (Feinberg Decl. ¶ 30(b).) Plaintiff's seizure disorder substantially increased the risks of surgery. (Feinberg Decl. ¶ 30(c).)

///

A few days after surgery, while Plaintiff was still at Stanford, he "coded" in the middle of the night and went into a coma which lasted a week. (Pl.'s Dep. 37:8-14.) The Stanford records indicate that Plaintiff suffered acute postoperative respiratory insufficiency, pleural effusion and acute pulmonary embolism, which is often fatal. (Feinberg Decl. ¶ 29.) Further, while Plaintiff was recovering from surgery at Stanford, he contracted an infection at the surgery site and had a 102.9-degree temperature. (Feinberg Decl. ¶ 29; Pl.'s Dep. 37:18-24.)

**D.    Discussion**

As noted above, Plaintiff claims that Defendant Levine performed two "botched" surgeries on Plaintiff on May 6, 2010 and April 21, 2011, and that Defendant Forster refused to schedule Plaintiff for corrective surgery in 2011 and 2012. Defendant Levine argues that summary judgment should be granted in his favor because the evidence shows Levine complied with the standard of care in treating Plaintiff. Defendant Forster argues that summary judgment is appropriate because Plaintiff has presented insufficient evidence to create a triable issue of fact, as there is no indication that Defendant Forster was aware of any second recurrence of Plaintiff's hernias before he was paroled. Further, even assuming Plaintiff could show that his condition recurred and that Defendant Forster was aware of the recurrence, Defendant Forster argues that the evidence shows he was not deliberately indifferent because foregoing a third hernia surgery was a medically acceptable option here.

While the Eighth Amendment entitles an imate to medical care, it is violated only when a prison official acts with deliberate indifference to an inmate's serious medical needs. *Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012), *overruled in part on other grounds*, *Peralta v. Dillard*, 744 F.3d 1076, 1082–83 (9th Cir. 2014); *Wilhelm v. Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012); *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006). Plaintiff "must show (1) a serious medical need by demonstrating that failure to treat [his] condition could result in further significant injury or the unnecessary and wanton infliction of pain," and (2) that "the defendant's response to the need was deliberately indifferent." *Wilhelm*, 680 F.3d at 1122 (citing *Jett*, 439 F.3d at 1096); *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1991), *overruled on other grounds*, *WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc).

Deliberate indifference is shown by "(a) a purposeful act or failure to respond to a prisoner's pain or possible medical need, and (b) harm caused by the indifference." *Wilhelm*, 680 F.3d at 1122 (citing *Jett*, 439 F.3d at 1096). The requisite state of mind is one of subjective recklessness, which entails more than ordinary lack of due care. *Snow*, 681 F.3d at 985 (citation and quotation marks omitted); *Wilhelm*, 680 F.3d at 1122.

"A difference of opinion between a physician and the prisoner—or between medical professionals—concerning what medical care is appropriate does not amount to deliberate indifference." *Snow*, 681 F.3d at 987 (citing *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989)); *Wilhelm*, 680 F.3d at 1122-23 (citing *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1986)). Rather, plaintiff "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances and that the defendants chose this course in conscious disregard of an excessive risk to [his] health." *Snow*, 681 F.3d at 988 (citing *Jackson*, 90 F.3d at 332) (internal quotation marks omitted). In other words, so long as a defendant decides on a medically acceptable course of treatment, his actions will not be considered deliberately indifferent even if an alternative course of treatment was available. *Id*. Deliberate indifference may also be found if defendants "deny, delay, or intentionally interfere with [a prisoner's serious need for] medical treatment." *Hallet v. Morgan*, 296 F.3d 732, 734 (9th Cir. 2002).

### 1. Defendant Levine's Motion

The Court first addresses Defendant Levine's motion. Plaintiff first contends that Defendant Levine was deliberately indifferent to his medical needs because he did not use mesh during the May 6, 2010 surgery. The parties do not dispute that Plaintiff at the time had a ventral hernia and a smaller umbilical hernia which required surgical repair, nor do they dispute that Defendant Levine had discussed with Plaintiff using mesh to repair the hernia, and had an Ultrapro mesh system available during the procedure. They disagree as to whether Defendant Levine provided treatment that was medically acceptable under the circumstances.

According to the evidence presented, when Defendant Levine examined Plaintiff intraoperatively, he found in his medical opinion that it would be better to proceed without the use of mesh, due to Plaintiff's age and the nature and location of the defects. Dr. Gardiner, a

board-certified and experienced general surgeon, declares in support that he reviewed Plaintiff's medical records, Plaintiff's deposition transcript, and Defendant Levine's declaration, and opines that it was well within the standard of care for Defendant Levine to perform the hernia repair procedure without the use of mesh, based on his intraoperative findings and medical judgment. Further, despite the well-known medical risk of hernia recurrence, the procedure was somewhat successful, as it is undisputed that Plaintiff's umbilical hernia did not recur.

Plaintiff offers no competent evidence to dispute these facts. He only asserts his non-medical opinion that Defendant Levine "botched" the surgery and that the mesh should have been used. Differences in judgment between an inmate and prison medical personnel regarding appropriate medical diagnosis and treatment are not enough to establish a deliberate indifference claim. *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). Plaintiff's belief that his surgery was "botched" because mesh was not used, when the surgeon did not find it medically appropriate under the circumstances, shows a mere difference of opinion between a prisoner and medical staff, not deliberate indifference. *See Toguchi v. Soon Hwang Chung*, 391 F.3d 1051, 1058 (9th Cir. 2004). Therefore, there is insufficient evidence in this case for a reasonable finder of fact to determine that Defendant Levine was deliberately indifferent when performing the May 6, 2010 surgery.

Next, Plaintiff claims that Defendant Levine was deliberately indifferent in performing the second surgery on April 21, 2011. The parties do not dispute that Plaintiff's supra-umbilical hernia had recurred by the time of that surgical procedure, or that Defendant Levine performed that hernia repair using mesh. The procedure was completed without complication, and Plaintiff's medical records show that he was discharged on July 26, 2011 with no issues or problems, no recurrence, and with his incision well-healed. Plaintiff nevertheless contends that Defendant Levine's surgical treatment was not medically acceptable under the circumstances.

In support of summary judgment, Defendant Levine declares that the surgical procedure was the optimal procedure that he had the ability to perform to address Plaintiff's hernia, and any further, more complicated surgical repair would have had to have been done at a different facility by a different specialist. Also, Dr. Gardiner opines that Defendant Levine's use of surgical mesh

18

to repair Plaintiff's hernia in the second surgery was appropriate, and was done using a technique that was well within the standard of care. Finally, Dr. Gardiner explains that although Plaintiff's hernia eventually recurred, this is a well-known risk of hernia repair, and does not evidence a breach of the standard of care.

Here, Plaintiff has not presented sufficient evidence to create a triable issue of fact regarding whether Defendant Levine was deliberately indifferent in performing the second surgery on April 21, 2011. Plaintiff again relies upon his unsupported, non-medical opinion that the surgery was "botched" because it his hernia recurred. As discussed above, Plaintiff is not competent to testify regarding a medical matter, and therefore his opinion does not present sufficient evidence to defeat summary judgment on this issue. He has merely presented a difference of opinion between him and his medical provider, which does not show deliberate indifference under the Eighth Amendment.

Plaintiff also argues that there is a material issue of fact here because he allegedly saw Defendant Levine several times after his second surgery and showed him that the hernia had ruptured around the mesh, and Defendant Levine refused all medical treatment. As discussed above, Plaintiff had alleged in his verified first amended complaint that he saw Defendant Levine in September 2011 and February 2012 and showed him that his hernias had reoccurred, but Defendant Levine refused treatment. However, the medical records in this case show that Defendant Levine discharged Plaintiff from the hospital in April 2011 and discharged him from his clinic in July 2011 as asymptomatic, which is before the date that Plaintiff alleges his hernia recurred. There are no medical records of any consultations by Defendant Levine with Plaintiff in September 2011 or February 2012, and Defendant Levine denies seeing Plaintiff.

To explain the lack of any medical records supporting Plaintiff's version of these events, he states that "apparently" the medical records were "falsified" as a cover-up, but such purely speculative, unsupported statements are in the nature of "bald assertions or a mere scintilla of evidence" that is not sufficient to defeat summary judgment. *Stefanchik*, 559 F.3d at 929; *see also Matsushita Electric Industrial Co*., 475 U.S. at 586 (mere metaphysical doubt as to material facts not sufficient to oppose summary judgment.)

More importantly, Plaintiff does not dispute the fact that Defendant Levine was a general surgeon who was contracted by the California State prison system to see patients on referrals, and that he could not have seen Plaintiff unless he was referred by a primary care doctor for a surgery consultation. Plaintiff does not allege in any declaration or in his verified complaint, or present any other evidence, that he was referred to Defendant Levine after his second surgery for any consultation. Instead, he affirmatively alleges that Defendant Forster, Plaintiff's primary care physician, repeatedly refused to give him any surgical referral, and that Plaintiff requested to see a different surgeon anyway, and not Defendant Levine. Thus, there is no evidence to create a triable issue of fact regarding whether Plaintiff saw Defendant Levine after his July 2011 discharge. No reasonable jury could find based on the undisputed facts here that Plaintiff was referred to Defendant Levine after his second surgery. *See Scott v. Harris*, 550 U.S. 372, 380-81 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

In evaluating whether a medical provider's choice of care was medically acceptable, the inquiry is focused on whether the services are "at a level reasonably commensurate with modern medical science and of a quality acceptable within prudent professional standards." *Morales Feliciano v. Rossello Gonzalez*, 13 F. Supp. 2d 151, 208 (D. Puerto Rico 1998) (quoting *U.S. v. DeCologero*, 821 F.2d 39, 43 (1st Cir. 1987)). "The standard does not include the 'most sophisticated that money can buy' . . . but only that which is reasonably appropriate, 'within modern and prudent professional standards' in the field of medicine and health." *Id*. Here, Plaintiff does not dispute the evidence that the mesh procedure Defendant Levine used on April 21, 2011 was the optimal procedure that he had the ability to perform, and that even if Plaintiff had been referred to Defendant Levine again, Defendant Levine would not have been able to provide any further surgical treatment anyway. Thus, a reasonable trier of fact could only determine in this case that Defendant Levine's provision of treatment and medical care to Plaintiff was within the standard of care, and did not constitute deliberate indifference.

///

For these reasons, the Court finds that Defendant Levine has met his burden to show that there is no triable issue of fact regarding whether Defendant Levine was deliberately indifferent to a serious medical need in this case. Therefore, summary judgment should be granted in Defendant Levine's favor.

Defendant Levine also asserts that the Court should grant summary judgment on the basis of Plaintiff's failure to respond to certain requests for admission under Federal Rule of Civil Procedure 36. However, the Court finds that this argument need not be reached, based upon the above determination regarding the undisputed facts in this case.

**2.      Defendant Forster's Motion**

The Court next addresses Defendant Forster's summary judgment motion. Plaintiff contends that Defendant Forster was deliberately indifferent by not referring him for a third surgery before he paroled on February 27, 2012. Defendant Forster contends that Plaintiff has presented no evidence that his hernias recurred before he was paroled, or that Defendant Forster was aware of any second recurrence of his hernias. Further, even assuming that the hernia recurred and Defendant Forster was aware, Plaintiff cannot show that Defendant Forster was deliberately indifferent in foregoing a third surgery, because the evidence shows that this was a medically-acceptable option.

The medical records concerning Plaintiff's visits with Defendant Forster after his second surgery and before he was paroled do not show any complaints about Plaintiff's hernia recurring, or any evidence that Defendant Forster knew of any recurrence of the hernia. Defendant Forster also denies any complaints by Plaintiff regarding his hernia after the second surgery, or any medical evidence of any recurrence or need for another surgery. (Forster Decl. ¶¶ 27-29.)

Looking to whether Plaintiff has created a material dispute of fact regarding this issue, in his amended complaint he originally alleged that he first requested a third surgery for his recurred hernia from Defendant Forster on or about August 15, 2011. Now, he does not dispute the evidence presented by Defendant Forster that he *refused* both of his appointments with Defendant Forster in August, as shown by the medical records.

///

Plaintiff next alleged in his amended complaint that he was seen by Defendant Forster on or about November 15, 2011, and again requested a surgery. In his current opposition, he does not assert or otherwise discuss any appointments with Defendant Forster in November 2011 at all.

Finally, Plaintiff alleged in his amended complaint that he was seen by Defendant Forster for the final time before his parole on or about February 25, 2012, when he requested treatment again for his recurred hernia. Now, Plaintiff does not dispute that he refused treatment throughout the month of February 2012, and specifically refused to attend his final scheduled appointment with Dr. Forster before being paroled, on February 23, 2012.

Currently, Plaintiff relies on the medical records here which show that he was seen by Defendant Forster twice after his second hernia surgery, on September 22, 2011 and on October 18, 2011, for issues unrelated to his hernia. Plaintiff does not dispute the accuracy of the medical records regarding these visits, such as that he saw Defendant Forster on September 22, 2011 for a regularly scheduled appointment regarding his other chronic medical issues, or that he saw Defendant Forster on October 18, 2011 to request modifications to his chronos based on chronic back pain. He only disputes the portions of the records which state that he had no complaints about his hernia and that he was well-healed. Plaintiff states in his opposition that he told Defendant Forster at these appointments that his hernias had recurred and he requested a third hernia repair surgery, which requests were denied.

Defendant Forster argues that Plaintiff's current assertions in his opposition are an unsupported, self-serving sham affidavit that contradicts his deposition testimony in this case, and therefore the Court is not bound to accept these statements. *See Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991) ("The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony.") To apply the rule, the district court must make a factual determination that the new testimony flatly contradicts the earlier testimony in an attempt to create an issue of fact and avoid summary judgment. *Id.* at 266-67. In this case, Plaintiff's deposition testimony is muddled and he contradicts himself. Regarding Defendant Forster, Plaintiff testified that he does not remember

dates of conversations, he does not recall what Defendant Forster looks like, he does not remember his conversations with Defendant Forster, and he did not write anything down or keep any notes despite the fact that he sometimes keeps a diary. However, he also testified that he remembered asking Defendant Forster for a third surgery, and that Defendant Forster told him that he was within six months of his parole date, and that he could not do another surgery. Although he is not clear regarding the timing of the conversation, this is consistent with his allegations in his amended complaint, and it appears to be these allegations and prior testimony that he relies on in his opposition. Thus, the Court cannot find that Plaintiff's deposition testimony and current opposition are so inconsistent as to be clearly and unambiguously a sham, and does not recommend that the sham affidavit rule be applied.

The question still remains whether Plaintiff has presented enough evidence on this issue to raise a material dispute of fact for trial. Here, Defendant Forster argues that even assuming that Plaintiff's hernia had recurred before he was paroled, and that he had at some time made Defendant Forster aware of it, he still cannot show deliberate indifference because denying the surgery recommendation was not medically unacceptable under the circumstances. Dr. Feinberg opined that the denial of a third corrective surgery was medically acceptable under the circumstances, because of Plaintiff's medical history, physical conditions, and the risks of surgery, including the fact that the two previous corrective surgeries increased the chances of recurrence after the third surgery, and the high risks to Plaintiff's condition each time the hernia recurred.

To dispute this fact, Plaintiff relies on the evidence that a third hernia surgery was ultimately performed by Dr. Spain. As discussed above, Plaintiff must show that Defendant Forster's denial was medically unacceptable under the circumstances. As a prisoner, Plaintiff does not have unqualified access to health care, and is not entitled to the best treatment available. An inmate does not have the same unrestricted choice in receiving medical treatment as he would if he were not incarcerated.

In this case, it is undisputed that even in 2016, when Plaintiff was referred to outside hospitals for consultation regarding the potential surgery, those hospitals refused to do the

procedure. Instead, in Plaintiff's own words, they "referred me to what's called a tertiary care center or a specialty or specialist because they were not experienced enough to perform the extensive surgery that I required." (Pl.'s Dep. 20:13-16.) It is further undisputed that the tertiary care center which performed Plaintiff's surgery involves advanced and complex procedures and treatments, performed by medical specialists in state-of-the-art facilities. Thus, the option for surgery in this case was limited to highest level of care available in the medical profession. Yet even at that level of expertise and care, Plaintiff's own notes show that he was advised that one of his options was to do nothing, and that the likelihood of the risks of complication from the surgery was 20%, with a 5% chance of serious complications and a 20% chance of recurrence.

Plaintiff asserts that he was willing to run the risks of the surgery, but this is not sufficient to dispute that Dr. Spain found the above risks to him despite being treated at one of the best hospitals in the United States, and that Dr. Spain also suggested the option of doing nothing. Further, this does not dispute the opinion Dr. Feinberg that these were significant risks, and that they outweighed the benefits of surgery. (Feinberg Decl. ¶ 30. j, k.) At most, Plaintiff may have shown a difference in medical opinions regarding the risks of surgery between these doctors, which is not sufficient to show that Defendant Forster acted with deliberate indifference. *See Toguchi*, 391 F.3d 1057-58. Nor does Plaintiff dispute that even with the best care in the country, Plaintiff in fact suffered complications and nearly died.

Based on the foregoing, the Court finds that Defendant Forster has met his burden, and Plaintiff has not raised a triable issue of fact regarding whether Defendant Forster was deliberately indifferent in denying a third surgery consultation before Plaintiff was paroled. Therefore, summary judgment should be granted in Defendant Forster's favor.

Defendant Forster also asserts that the Court should grant summary judgment on the basis of qualified immunity. However, the Court finds that this argument need not be reached, based upon the above determination regarding the undisputed facts in this case.

///

///

///

**III.     Conclusion and Recommendations**

Accordingly, it is HEREBY ORDERED that Defendant Forster's motion to modify the scheduling order *nunc pro tunc*, filed on July 27, 2017 (ECF No. 51), is granted, to the extent explained above.

Further, for the reasons explained above, IT IS HEREBY RECOMMENDED that:

1.     Defendant Levine's motion for summary judgment, filed July 7, 2017 (ECF No. 49) be granted; and

2.     Defendant Forster's motion for summary judgment, filed October 30, 2017 (ECF No. 60), be granted.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within **fourteen (14) days** after being served with these Findings and Recommendations, the parties may file written objections with the Court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. *Wilkerson v. Wheeler*, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).


IT IS SO ORDERED.

Dated:   __**March 8, 2018**__          _____/s/ _Barbara A. McAuliffe_____
                                        UNITED STATES MAGISTRATE JUDGE